**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID RUSSELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:06CV96ERW/MLM** |
| | ) | |
| **MICHAEL J. ASTRUE,[1]** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying the application of David Russell ("Plaintiff") for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. Plaintiff has filed a brief in support of the Complaint. Doc. 15. Defendant has filed a brief in support of the Answer. Doc. 16. The cause was referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to Title 28 U.S.C. § 636(b).

**I.**
**PROCEDURAL HISTORY**

On January 27, 2004, Plaintiff filed applications for disability benefits under Title II of the Social Security Act and for SSI benefits pursuant to Title XVI of the act, alleging a disability onset date of December 12, 2003. Tr. 130-32. The applications were denied on August 9, 2004. Tr. 46-50,

---

[1] Michael J. Astrue has been appointed to serve as Commissioner of Social Security. Therefore, the Court has substituted Michael J. Astrue for Jo Anne B. Barnhart as the Defendant in this suit pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

103-07. Plaintiff requested a hearing, which was held on December 7, 2005, before Administrative Law Judge ("ALJ") James E. Seilor. Tr. 21-35. The ALJ found that Plaintiff was not under a disability as defined in the Social Security Act. Tr. 11-20.

On May 8, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review of the ALJ's decision. Tr. 5-8. Thus, the decision of the ALJ stands as the final decision of the Commissioner. Tr. 5.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that at the time of the hearing, he was thirty-two years old; that he was six feet tall and weighed 290 pounds; and that he was living with his wife and two children, ages seven and fourteen. Plaintiff also testified that he completed the twelfth grade and some college and that he had not received any specialized training. Tr. 24-25.

Plaintiff testified that he can sweep or vacuum for ten to fifteen minutes at a time; that he does not cut the grass in his yard; that he does not do laundry; that his cooking is limited to making sandwiches; that he is unable to be involved in his son's school activities; that he does not socialize often; and that he sometimes goes to church on Sundays. Plaintiff also testified that he is able stand for about twenty minutes; that he can walk around for about ten minutes; that he "can't sit in one position real long"; that he spends much of the day sitting in a recliner watching television and listening to the radio; that he can sit at the computer for about ten minutes; and that he drives two or three times per week. Tr. 30-34.

Plaintiff further testified that he last worked in December 2003 as a stuffer at the Rowe Furniture Company, where he had worked since 1993. Plaintiff stated that he injured his back on March 28, 2002; that he was subsequently put on "light duty" and was restricted to lifting ten pounds;

that he had surgery, a three level fusion with hardware, on December 12, 2003; that he was under the care of doctors for the "18 months or so" preceding the surgery; and that prior to surgery, his doctors treated his symptoms with "[e]pidurals, nerve blocks, tons of medication." Tr. 25-28.

Plaintiff testified that he has used a cane provided by his doctor for stability since his surgery; that he has never fallen; that he experiences "extremely bad pain" near the surgery site which pain Plaintiff described as a seven to eight out of ten; that "at least two or three times a week" his pain is so bad that he does not get up much during the day; that his level of pain between the surgery and the hearing had "[s]tayed about the same"; and that at the time of the hearing he was taking Methadone four times a day and Celebrex twice a day and he had been in pain management for over a year. Tr. 28-30.

Plaintiff further testified that he had a workman's compensation claim pending at the time of the hearing; that he had never been evaluated by a workman's compensation doctor; and that his wife started working after he stopped working and he relied on her income. Tr. 33-34.

### III.
### MEDICAL RECORDS

On April 9, 2002, E.R. Habert, M.D., at Cape Imaging MRI in Cape Giradeau, Missouri, noted that Plaintiff had low back pain and numbness in his left leg; that Plaintiff was injured at work on March 28, 2002; that Plaintiff was symptomatic from the date of the accident; and that Plaintiff denied any previous surgery on his back. Dr. Habert reported on this date that Plaintiff had an MRI. Dr. Habert's findings from reading the MRI of Plaintiff's lumbar spine included:

> [D]egenerative disc signal loss at L3-L4, L4-L5, and L5-S1 with narrowing of the interspaces. The superior two lumbar discs show normal disc hydration and signal intensity. The alignment of the vertebral column is normal. The distal conus is normal. The soft tissue structures around the spinal column that are visualized are considered to be within normal limits. There is some encroachment on the neural canals bilaterally at the three degenerative disc levels. There is still fat surrounding the existing nerve roots without evidence of significant compression of the exiting nerve roots. There

is no recent or old fracture or destructive bone disease. The visualized sacrum appears to be intact. . . . At L3-L4, there is a generalized smooth posterior convex margin with a prominent anulus but without a focal disc protrusion or canal stenosis at L3-L4. At L4-L5, the appearance is very similar to L3-L4. At L5-S1, there is an asymmetry of the posterior anulus suggesting a right parasagittal and right lateral disc protrusion involving the right neural canal and extending slightly lateral of the neural canal. The right S1 nerve root has been displaced posteriorly by this defect. The patient's symptoms, however, apparently are in his left lower extremity.

Tr. 298.

Dr. Habert's impression was: "1. Degenerative disc disease, L3-L4, L4-L5, and L5-S1 with narrowed interspaces. 2. Prominent anulus at L3-L4 and L4-L5. 3. Asymmetric disc protrusion involving the right neural canal and right parasagittal spinal canal." Tr. 298.

On May 13, 2002, Calin A. Savu, M.D., examined Plaintiff at the St. Bernards Medical Center, Center for Pain Management, in Jonesboro, Arkansas. Dr. Savu's notes of this date state that Plaintiff reported that he was injured in March 2002 after lifting a package that weighed approximately fifty pounds, and that "[t]he pain continued unabated ever[] since . . . ." Pursuant to a physical examination Dr. Savu reported that Plaintiff was "in moderate distress, moving around gingerly with obvious difficulty in a slightly flexed forward posture. No other overt pain behaviors are noted." Dr. Savu further reported that Plaintiff had a "[w]addling gait with a somewhat widened base." Dr. Savu's diagnoses included "[l]eft lumbar radiculopathy most likely as a combination of degenerative disc and nondisc disease as well as redundancy of some of the tissues which may buckle and cause further narrowing of the outlet." The "differential diagnosis" included lumbosacral spondylosis with facet disease and atypical somatic referral as well as discogenic pain syndrome. Dr. Savu also reported that on this same date Plaintiff underwent an interlaminar epidural steroid injection and lumbar epidurogram at L5-S1. Tr. 315-318.

Medical records reflect that on May 28, 2002, Dr. Savu administered left lumbar medial blocks on the Plaintiff to address the lumbosacral spondylosis with facet. Tr. 314.

Dr. Savu's records reflect that on August 22, 2002, he diagnosed Plaintiff with discogenic pain syndrome, and performed a provocative discogram at L2-L3, L3-L4, L4-L5, and L5-S1. Dr. Savu's notes of this date further state that Plaintiff had "[s]trongly concordant pain with diffuse degeneration at L3-L4 and L4-L5 and what appeared to be a right posterolateral tear at L5-S1." Tr. 312-13.

Medical records reflect that Plaintiff was seen at by Yuli Soeter, M.D., at the Pain Management Center on May 1, 2003, and that Dr. Soeter diagnosed Plaintiff with discogenic pain and low back pain with lower extremely radicular pain symptoms on this date. Tr. 308.

Dr. Soeter's records reflect that he saw Plaintiff for a follow-up visit on June 5, 2003, and that on that date Dr. Soeter recommended water therapy for Plaintiff's low back pain and bilateral lower extremity pain and a lumbar epidural steroid injection ("LESI") with IV sedation "as a diagnostic possibly therapeutic treatment." Tr. 304.

On June 10, 2003, Phyllis Hansen, RN, of the Pain Management Center, reviewed Plaintiff's file and noted that Plaintiff had "degenerative disc disease, herniated disc at L5-S1 which is associated with some osteophytosis and annular tear seen at this level." Nurse Hansen reported on this date, pursuant to a muscoskeletal examination, that Plaintiff's "[d]eep tendon reflexes [were] decreased in his right leg, his patella as well as his Achilles." Nurse Hansen noted that Plaintiff had "difficulty getting up and down from the chair"; that there were "popping sounds in his knees"; that Plaintiff had "tenderness in his low back"; that his motor strength was 5 out of 5; that his dorsalis pedis pulses were "better than average"; that his lower extremities were "warm to the touch"; and that Plaintiff had no edema. Nurse Hansen's assessment was that Plaintiff had low back degenerative joint disease ("DJD"). Nurse Hansen noted that Plaintiff was to have a lumbar epidural steroid injection ("LESI") with sedation pursuant to Dr. Soeter's orders and that he was to follow-up with Dr. Soeter in two

weeks for another LESI with sedation, depending on whether the LESI Plaintiff was to receive that day was actually therapeutic in nature. Tr. 301-302.

Plaintiff received a LESI on June 10, 2003, from Dr. Soeter. Tr. 303.

Office notes of Kee B. Park, M.D., neurosurgeon, reflect that this doctor saw Plaintiff on July 24, 2003. Tr. 265. Dr. Park's notes reflect that after Dr. Savu performed a discogram on Plaintiff he "again recommended surgery"; that Plaintiff's care was transferred to David Kennedy, M.D.; that Dr. Kennedy told Plaintiff that he "has to live with the pain"; that Plaintiff was released from workmen's compensation; that Dr. Soeter administered injection which Plaintiff paid for himself; that the injection did not result in significant improvement; and that Plaintiff was seeking Dr. Park's opinion as to whether anything could be done to help Plaintiff's back pain. Dr. Park's notes state that Plaintiff's medications as of July 24, 2003, included Vicoprofen, Zyprexa, Serzone, Neurontin, Talwin, Benicar, and Nexium. Dr. Park's notes state that he was going to "start his evaluations fresh" and that he ordered a new MRI of the lumbar spine. Tr. 265.

Dr. Park reported on August 4, 2003, after reviewing the MRI of Plaintiff's lumbar spine taken that day, that normal lumbar lordosis was preserved; that the spinal cord had normal signal; that the vertebral bodies had normal signal; that the L1-L2 and L2-L3 discs were normal; that the L3-L4 disc showed evidence of desication; and that there was no definite herniation. Dr. Park's impression on this date was "1) L3-L4 degenerative disease, 2) L4-L5 board disc protrusion with possible migration superiorly and left sided modic changes, [and] 3) L5-S1 dis protrusion towards the right side with displacement of the right L5 nerve root." Tr. 295.

Dr. Park's notes of August 4, 2003 state that the MRI showed disc degeneration at L3-L4, L4-L5, and L5-S1; that at the L4-L5 level "there [was] high intensity early modic changes on the left side"; and that at the L5-S1 level "there [was] a right sided foraminal encroachment due to a disc

protrusion as well." Dr. Park recommended that Plaintiff undergo a lumbar discogram to identify which levels if any are the source of his back pain. Dr. Park noted that this procedure was scheduled for August 21, 2003, at the Auburn Surgery Center. Tr. 264.

Dr. Park's September 4, 2003 treatment notes state that Plaintiff had concordant pain at L3-L4, L4-L5, and L5-S1; that Plaintiff needed to undergo a fusion at these levels, as he had failed conservative treatment, including injections and therapy; that Plaintiff's pain had been going on for a year and a half; that Plaintiff was to undergo an L3-L4, L4-L5, and L5-S1 bilateral diskectomy, interbody fusion with interbody prosthesis and posterolateral fixation with intertransverse fusion using local bone and iliac crest bone; that Plaintiff would need to wear an LSO brace for three months as well as an Orthofix bone growth stimulator; and that Dr. Parks instructed Plaintiff to stop smoking. Tr. 263.

Dr. Kennedy reported that he saw Plaintiff on September 23, 2003 and that Plaintiff said that he still had pain despite therapy and multiple injections and that his pain was primarily in the lower lumbar area. Dr. Kennedy's notes state that Plaintiff was working with restrictions; that he was taking two Lorcet every four to six hours and Skelaxin usually five or six times daily; that Plaintiff's low back range of motion was slightly reduced; that his straight leg raising caused back pain with dull leg pain at seventy to ninety degrees; and that the MRI from August 24, 2003 demonstrated degenerative disc changes in L3-L4, L4-L5, and a possible disc prolapse at L4-L5 as well L5-S1. Dr. Kennedy's notes state, "notably [Plaintiff] does not seem to have any compatible sciatica or nerve root tension" and that Plaintiff was to have a lumbar myelogram to assess his situation in more detail. Tr. 284.

In a consultation report dated October 8, 2003, Dr. Kennedy compared a post myelogram of Plaintiff's lumbar spine performed on October 8, 2003 with a prior study from October 9, 2002. Dr. Kennedy noted that there was a posterolateral protrusion of the disc at the L5-S1 level associated

with some calcification and spurring, causing encroachment upon the right nerve root canal; that there was slight posterior displacement of the right S1 nerve root sleeve; that there was no mass-effect upon the opacified subarachnoid space; and that no other protrusions were seen. Tr. 289. Dr. Kennedy's impression was right-sided calcified disk protrusion at L5-S1 encroaching upon the right nerve root canal and that there had been no change from October 9, 2002. Tr. 289. Dr. Kennedy further reported on October 8, 2003, that findings from a lumbar myelogram of that date showed mild anterior extradural defect present at L3-L4 and L4-L5 and some mild posterior end-plate osteophytic ridging at L4-L5. Dr. Kennedy also noted that "a lateralizing extradural defect is not seen. The nerve root sleeves fill in a symmetric fashion." Tr. 290.

In an operative report dated December 11, 2003, Dr. Park stated that Plaintiff underwent an L3-L4, L4-L5, L5-S1 bilateral microdiscketomy, posterior lumbar interbody fusion using interbody spacers and pedical screws with right iliac crest harvest. Dr. Park further reported that Plaintiff would "need to wear an LSO brace for three months as well as an Orthofix bone growth stimulator"; that Dr. Park advised Plaintiff to stop smoking; and Plaintiff agreed to try. Tr. 270.

A physician discharge summary from St. Francis Medical Center, dated December 15, 2003, reflects that Plaintiff was admitted on December 12, 2003, with back pain and that bilateral straight leg raise test was positive for lower back pain and that the diagnosis was L3-L4, L4-L5, L5-S1 degenerative disc disease with discogenic pain and disc herniation. Tr.268.

Dr. Park's office note of January 15, 2004 states that Plaintiff was "four weeks out from his three level lumbar fusion. His x-rays are stable. His back pain is much better." Tr. 261. Dr. Park's x-rays report from the same date states that "[t]here is interbody prosthetic devices and pedical screw fixation at L3-L4, L4-L5, and L5-S1. No evidence of instrument failure." Tr. 262.

In an x-ray report dated March 25, 2004, Dr. Park stated that there was posterior screw fixation with interbody prosthesis at L3-L4, L4-L5, and L5-S1, with no evidence of hardware failure. Tr. 260. Dr. Park's office note of that same date reflect that Plaintiff was "three months out from his two-level fusion"; that Plaintiff's back pain was better; that he let Plaintiff out of his back brace; and that Plaintiff was to start a lumbar stretching program and a lumbar stabilization program. Tr. 259.

In an office note date May 24, 2004, Dr. Park stated that Plaintiff was "five and a half months out from his lumbar fusion surgery at L3-L4, L4-L5, and L5-S1"; that Plaintiff "has done quite well"; that his x-rays were stable; that Dr. Park asked Plaintiff to continue wearing the stimulator; and that Plaintiff would be seen again in six weeks for a CT scan to assess the fusion. Tr. 258.

Dr. Park's July 8, 2004 office note states that Plaintiff was "six months out from his lumbar fusion"; that the CT scan administered on that day showed "good interbody fusion at all three levels"; that Dr. Park let Plaintiff begin a physical therapy program; that Dr. Park refilled Plaintiff's prescription for Lorcet Plus; and that he would try to wean Plaintiff off of narcotics. Tr. 256. Dr. Park stated in a July 8, 2004 CT scan report that the CT scan "reveal[ed] pedicle screws that are placed at L3 to S1 with good positioning of all screws with no evidence of loosening." The CT scan report further stated that "[i]nterbody titanium spacers are well embedded with good bone growth through and around it consistent with solid interbody fusion at all three levels." Tr. 257.

Records of the Kneibert Clinic, LLC, reflect that Plaintiff was seen by Jim Wilkerson, M.D., on July 26, 2004. Dr. Wilkerson's notes of this date reflect that Plaintiff complained of problems with sleep, being on edge, and increased irritability; that Plaintiff stated that his mood was down, with poor concentration and anxiousness; and that Dr. Wilkerson diagnosed Plaintiff with depression, and prescribed treatment with Lexapro and Trazadone, with a follow-up appointment scheduled two weeks later. Tr. 241.

Dr. Wilkerson's notes reflect that he saw Plaintiff on August 10, 2004, at which time Plaintiff complained of irritability, agitation, concentration, and insomnia; that Plaintiff's medication included Lexapro, Trazodone, Lorcet, and Robaxin; that diagnoses included depression and insomnia; that Plaintiff's Lexapro and Trazodone were increased; and that Plaintiff was referred to a pain clinic. Tr. 239.

Dr. Wilkerson's records reflect that he saw plaintiff on August 24, 2004; that Plaintiff's depression improved on Lexapro; that Plaintiff was still having trouble sleeping; that Plaintiff said that he felt sleepy and could not shut his mind off; that Plaintiff stated that he had no problems with medications; that Dr. Wilkerson's diagnosis was insomnia and depression; and that Dr. Wilkerson prescribed Ambien. Tr. 237.

Dr. Wilkerson's records reflect that he saw Plaintiff on September 15, 2004 ; that Plaintiff had run out of medication; and that Ambien had helped with Plaintiff's insomnia. Tr. 234.

Records of Abdul N. Naushad, M.D., reflect that this doctor examined Plaintiff on October 16, 2004. Dr. Naushad's notes of this date reflect that Plaintiff's chief complaint was lower back pain; that Plaintiff had a negative straight leg sign, a positive Patrick sign, and tenderness at L2, L3, L4, L5, and S1; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits, intact cranial nerves, and a normal gait; that Dr. Naushad prescribed Lorcet. Tr. 254.

In a letter to Dr. Wilkerson dated October 18, 2004, Dr. Naushad described the October 16, 2004 examination of Plaintiff. Dr. Naushad reported in this letter that Plaintiff's diagnosis was degenerative disc / joint disease, facet arthropathy, and failed back syndrome. Lifestyle modification included: physical therapy, daily or alternative days exercise, stopping smoking, avoidance of stress, no lifting more than fifteen-to-twenty pounds, no extreme bending or twisting, no reaching high

objects, and weight loss. Dr. Naushad prescribed Lorcet and stated that Plaintiff could benefit from having pain blocks. Tr. 252.

Dr. Wilkerson's notes reflect that he saw Plaintiff on December 17, 2004, for insomnia, depression, and chronic lower back pain; that Plaintiff was being seen at a pain clinic for his chronic lower back pain; and that Plaintiff's insomnia and depression were stable. Tr. 233.

Dr. Naushad's notes of January 12, 2005 reflect that Plaintiff complained of lower back pain which was increased by bending and standing; that Plaintiff had a negative straight leg sign, a positive Patrick sign, and tenderness at L1, L2, L3, L4, and L5; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits, intact cranial nerves, and a normal gait; and that Plaintiff's medications included Lorcet and Lidoderm. Tr. 251.

Dr. Wilkerson's notes reflect that he saw Plaintiff on January 17, 2005, on which date Plaintiff's diagnosis was with acute bronchitis with bronchospasm. Tr. 231.

Dr. Wilkerson's notes further reflect that he saw Plaintiff on January 20, 2005, for shortness of breath and wheezing; that Plaintiff's medications included Amoxil, Prednisone, Albuterol ebulizer, and Robitussin; and that Plaintiff's acute bronchitis and bronchospasm had improved. Tr. 229.

A radiological interpretation of a CT Scan of Plaintiff's lumbar spine dated January 20, 2005 states that there were surgical changes extending from L3 through S1; that there was screw fixation extending from L3 through S1; that disc spaces contained cage supports; and that L3 and S1 were not very clear on the AP films due to a metallic artifact. Tr. 255.

Dr. Naushad's notes of February 11, 2005 reflect that Plaintiff complained of constant lower back pain, radiating into the right buttock and thigh; that Plaintiff had a positive straight leg sign, and a positive Patrick sign; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits,

intact cranial nerves, and a normal gait; and that Plaintiff was prescribed Percocet and Feldene. Tr. 249.

Records from Dr. Naushad dated March 11, 2005, reflect that Plaintiff's medications included Methadone; that Plaintiff reported having lower back pain for two years with the pain described as constant, throbbing, sharp, and radiating into the right and left buttock; that Plaintiff's pain was relieved by medication; that Plaintiff had a positive straight leg raise, a positive Patrick sign, present ankle jerk, present knee jerk, and tenderness at L1, L2, L3, L4, and L5; and that Plaintiff's gait was normal. Tr. 247.

Records from Dr. Naushad dated April 11, 2005, reflect that Plaintiff's chief complaint was lower back pain; that his pain was relieved by resting and medication; that Plaintiff had a positive straight leg sign, negative Patrick sign, present knee jerk, present ankle jerk, and tenderness at L2, L3, L4, L5, S1 and facet; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits, intact cranial nerves, and a normal gait; and that Plaintiff's medications included Methadone and Feldene. Tr. 245.

Dr. Wilkerson's records reflect that he saw Plaintiff on April 18, 2005; that Plaintiff "denie[d] a depressed mood most of the day and a diminished interest in his usual daily activities"; that Plaintiff was well developed and nourished and in no acute distress; that Plaintiff was alert and cooperative; that Plaintiff had normal mood and affect; that he had normal attention span and concentration; that he was oriented; that Plaintiff denied "significant weight loss, significant weight gain, insomnia, hypersomnia, psychomotor retardation, fatigue, feelings of worthlessness (guilt), impaired concentration (indecisiveness), and recurrent thoughts of death or suicide"; that Plaintiff's depression was "stable"; and that Dr. Wilkerson prescribed Lexapro and Trazadone for Plaintiff. Tr. 226.

Dr. Wilkerson's notes reflect that he saw Plaintiff for a three-month check-up and general medical evaluation on July 18, 2005. Dr. Wilkerson reported on this date that Plaintiff was "doing well and [was] not having any significant new complaints"; that Plaintiff "[d]oes well as long as he is compliant with meds"; that Plaintiff "denie[d] depression, anxiety, memory loss, suicidal ideation, hallucinations, paranoia, phobia, and confusion"; that Plaintiff was "well developed, well nourished, and in no acute distress"; that Plaintiff was "alert and cooperative"; and that Plaintiff had "normal mood and affect," "normal attention span and concentration," and was oriented. Dr. Wilkerson's notes further state that his assessment on this visit was depression; that Plaintiff was to stop Lexapro and continue with Trazodone and Welbutrin; and that Plaintiff was prescribed Ambien for insomnia. Tr. 222-23.

Dr. Naushad's records reflect that Plaintiff was seen on August 8, 2005, on which date Plaintiff complained of lower back pain with radiation into the right and left buttocks. Records state that medication relieved Plaintiff's pain; that Plaintiff's straight leg sign was positive; that his Patrick sign was negative; that he had tenderness at L2, L3, L4, L5, S1, and the facet joints; that he had no muscle loss, no trigger points, no neurosensory deficits, intact cranial nerves, and a normal gait; that Plaintiff was on Methadone and Feldene; and that the Methadone and Feldene were "helpful." Tr. 212-13.

Dr. Wilkerson's notes reflect that he saw Plaintiff on August 9, 2005, on which date Plaintiff's chief complaint was that he had problems with medication. Dr. Wilkerson's notes of this date state that Plaintiff was "irritable" and "more nervous," with hands shaking; that Plaintiff complained of anxiety; that he denied hallucinations, and paranoia, and psychomotor agitation; that Plaintiff had begun Wellbutrin three weeks prior to this appointment; that Plaintiff was "well developed, well nourished, and in no acute distress"; that he had "no focal deficits, CNII-XII grossly intact with

normal reflexes, coordination, muscle strength and tone"; and that Plaintiff was "agitated"; that Dr. Wilkerson advised Plaintiff to discontinue Wellbutrin. Dr. Wilkerson diagnosed Plaintiff with depression and a drug reaction and advised Plaintiff to return for a follow-up visit in one week. Tr. 219-20.

Dr. Wilkerson's records reflect that he saw Plaintiff on August 16, 2005. Dr. Wilkerson's notes of this date state that Plaintiff reported that he was "doing much better. Irritability and personality is improved. More relaxed." Tr. 217. Dr. Wilkerson further reported that Plaintiff was "well developed, well nourished, and in no acute distress"; that he was alert and cooperative; that he had normal mood and affect; that he had normal attention span and concentration; that he was oriented; that Plaintiff's depression was "stable"; that Plaintiff's medications for depression included Trazodone, Hydroxyzine, and Prozac; and that Plaintiff was to follow-up in three months. Tr. 217-18.

Dr. Naushad's records reflect that Plaintiff was seen on September 9, 2005, on which date Plaintiff reported that his lower back pain "comes and goes" and was throbbing, and that it was relieved by medication. Dr. Naushad's notes state that Plaintiff had a negative straight leg sign and a negative Patrick sign; that Plaintiff reported tenderness at L2, L3, L4, L5, S1, and the facet joints; and that Plaintiff's gait was normal. Tr. 210-11.

Dr. Naushad's records reflect that he saw Plaintiff on October 10, 2005, on which date Plaintiff complained of intermittent lower back pain. Dr. Naushad's records of this date reflect that Plaintiff had a negative straight leg sign, negative Patrick sign, and tenderness at L3, L4, L5, and S1; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits, intact cranial nerves, and a normal gait; and that Plaintiff's medications included Methadone and Celebrex. Tr. 208-209.

Dr. Wilkerson's records state that he saw Plaintiff for a three-month check-up on October 18, 2005, for depression, back pain, and a general medical evaluation; that Plaintiff's medication had been switched to Prozac and Plaintiff was "[d]oing well on this medication"; that Plaintiff "denie[d] depression, anxiety, memory loss, suicidal ideation, and confusion"; that Plaintiff was "well developed, well nourished, and in no acute distress"; that Plaintiff had "no focal deficits, CNII-XII grossly intact with normal reflexes, coordination, muscle strength and tone"; that Plaintiff was alert and cooperative; that she had normal mood and affect; that she had normal attention span and concentration; that she was oriented; that Plaintiff's depression was "stable"; Plaintiff's updated medication list included Trazodone, Hydroxyzine, Prozac, Celebrex, and Ambien. Tr. 215-16.

Dr. Naushad's records reflect that he saw Plaintiff on November 9, 2005, and that during this visit Plaintiff complained of pain in his lower back and that Methadone was no longer helping. Dr. Naushad's notes of this date state that Plaintiff said his pain was six out of ten level with medication and nine to ten out of ten without medication. Dr. Naushad's diagnosis of Plaintiff included degenerative disc disease, lumbar facet syndrome, and lumbar post-laminectomy syndrome. Dr. Naushad's notes state that Plaintiff's medications included Methadone, Celebrex, and Motrin; that knee jerks were present; that Patrick sign was negative; that straight leg sign was negative; that Plaintiff displayed tenderness at L3, L4, L5, and S1; that Plaintiff had no muscle loss, no trigger points, no neurosensory deficits, and intact cranial nerves; and that Plaintiff walked with a cane. Tr. 205-207.

Dr. Naushad's records reflect that he saw Plaintiff on November 23, 2005; that Plaintiff's chief complaint on this date was constant pain on the left side of his back; that Plaintiff said that the pain was mostly localized and that sometimes the pain radiated into the left hip; that Plaintiff was

prescribed Motrin; that there were no adverse events; and that Plaintiff's activities of daily living were the same. Tr. 203-204.

# IV.
## DECISION OF THE ALJ

After considering the evidence of record, the ALJ concluded that Plaintiff was "not disabled" within the meaning of the Social Security Act, at any time through the date of the decision. Tr. 14, 20. The ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act on December 12, 2003, the date Plaintiff stated that he became unable to work, and Plaintiff continued to meet these status requirements through the date of the decision. Tr. 15, 19. The ALJ found that Plaintiff had not engaged in substantial gainful activity since December 12, 2003. Tr. 19.

The ALJ further found that the combination of Plaintiff's degenerative disc disease, lumbar post-laminectomy syndrome, and lumbar facet syndrome were "severe," as defined in the Social Security Act; that Plaintiff's history of depression was not "severe"; that the medical evidence did "not demonstrate medical signs and findings, which could reasonably be expected to produce all of the symptoms and limitations alleged"; that Plaintiff had a relatively limited history of medical treatment since his surgery in December 2003; the ALJ found, therefore, that Plaintiff's impairments and treatment were "inconsistent with severe and disabling symptoms." Tr. 15-19.

The ALJ compared Plaintiff's signs, symptoms, and laboratory findings with the criteria specified in the Listing of Impairments, Appendix 1, Subpart P, Regulations No. 4, and concluded that Plaintiff's impairments were not attended by medical findings which meet or were equal to the requirements of any listed impairment. Tr. 15, 19.

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"). The ALJ found that Plaintiff has the RFC to occasionally lift and carry then pounds, frequently lift and carry less than ten pounds, sit six hours in an eight-hour workday, stand or walk for two hours in an eight-hour

workday, occasionally stoop and crouch, and push or pull consistent with his lifting limitations. The ALJ further found that Plaintiff has no manipulative, visual, communicative, or environmental limitations and that Plaintiff has no limitations resulting from a mental impairment. Tr. 18, 19.

After considering, among other things, the medical evidence, the opinions of doctors, Plaintiff's daily activities, Plaintiff's use of medications, and Plaintiff's appearance and demeanor at the hearing, the ALJ did not find Plaintiff credible. Tr. 17-18.

The ALJ concluded that Plaintiff was unable to perform his past relevant work; that Plaintiff was a "younger individual" and had completed twelfth grade; that Plaintiff did not have any acquired work skills which would be transferable to the skilled or semiskilled work activities of other work; that Medical Vocational Rule 201.27 applies and directs a finding of "not disabled"; and that Plaintiff had not been under a "disability," as defined by the Act, at any time through the date of the decision. Tr. 19, 20.

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has

an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v.

Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).  In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535.  See also Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision"); Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994);  Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Instead, the district court must simply determine  whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence").  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't. of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot

perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc). The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly determine Plaintiff's RFC pursuant to Singh v. Apfel, 222 F.3d 448 (8th Cir.

2000) and <u>Lauer v. Apfel</u>, 245 F.3d 700 (8th Cir. 2001), because the ALJ failed to properly consider Plaintiff's subjective complaints pursuant to <u>Polaski</u>, and because there was substantial evidence of a non-exertional limitation and ALJ did not take testimony from a licensed vocational expert about Plaintiff's significant non-exertional impairments.

## A.    Residual Functional Capacity:

Plaintiff contends that the ALJ's finding regarding Plaintiff's RFC is not supported by substantial evidence. The ALJ found that Plaintiff has the RFC to occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, sit six hours in an eight-hour workday, stand or walk for two hours in an eight-hour workday, occasionally stoop and crouch, and push or pull consistent with his lifting limitations. The ALJ further found that Plaintiff has no manipulative, visual, communicative, or environmental limitations and that Plaintiff has no limitations resulting from a mental impairment.  The ALJ concluded  that Plaintiff has the RFC to perform sedentary work.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." <u>Lauer</u>, 245 F.3d at 703. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) (quoting <u>McKinney</u>, 228 F.3d at 863. To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Here, the ALJ considered Plaintiffs' doctors records (Tr. 15-18), then determined Plaintiff's RFC. (Tr. 18). Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional

capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth

Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d

865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the

ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,'

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least

some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

     RFC is "an administrative assessment of the extent to which an individual's medically

determinable impairment(s), including any related symptoms, such as pain, may cause physical or

mental limitations or restrictions that may affect his or her capacity to do work-related physical and

mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is

the individual's maximum remaining ability to do sustained work activities in an ordinary work setting

on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's

abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has limitations or

restrictions beyond those caused by his or her medical impairment(s) including any related symptoms,

such as pain." Id.

     "RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As

stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC.

Stormo, 377 F.3d at 806. "If a claimant establishes [his or] her inability to do past relevant work, then

the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d

at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the

burden of proof, the Commissioner has the burden of production at Step 5. Charles, 375 F.3d at 782

n.5.  At Step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the

claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790.

Also, at Step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit held in Eichelberger, 390 F.3d at 591:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. Pursuant to this requirement, the ALJ found that Plaintiff's functional limitations included lifting no more than ten pounds and avoidance of prolonged standing and walking. Only after defining Plaintiff's limitations and restrictions did the ALJ conclude that Plaintiff's restrictions do not preclude him from engaging in sedentary work.

In support of his argument that the ALJ's finding regarding Plaintiff's RFC, Plaintiff alleges that the ALJ failed to ensure that the record was fully and fairly developed from the treating sources. The duty to develop the record includes the duty to develop the record as to the medical opinion of the claimant's treating physician. Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing Brown v. Bowen, 827 F.2d 311, 312 (8th Cir.1987); Brissette v. Heckler, 730 F.2d 548, 549-50 (8th

Cir.1984); Thorne v. Califano, 607 F.2d 218, 219-20 (8th Cir.1979). Indeed, the Regulations provide, at 20 C.F.R. § 404.1624(c)(3), that "[i]f the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information." The Eighth Circuit holds that "'if a treating physician has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record.'" Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir.1983). However, where a treating physician does not express an opinion as to whether a claimant satisfied the Social Security Act's disability listings, the claimant must demonstrate that the opinions of the treating doctors could not "be adequately related to" the disability listings. Id. See also Weiler v. Apfel, 179 F.2d 1107, 1111 (8th Cir. 1999). Where the record contains medical records and opinions of doctors, other than a claimant's treating physician, each of whom evaluated the claimant's limitations, an ALJ need not recontact the claimant's treating doctor. See id.

In the matter under consideration, contrary to Plaintiff's assertion, the ALJ did not have a duty to recontact Plaintiff's treating physicians to obtain their opinions regarding Plaintiff's functional limitations. First, it is Plaintiff's responsibility to provide medical evidence to show that he is disabled. See C.F.R. §§ 404.1512, 416.912; see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995) ("It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC.")).

Second, the duty to recontact a treating source only arises if a crucial issue is undeveloped. See Goff, 421 F.3d at 791 ("Here, the ALJ did not find the doctors' records inadequate, unclear, or incomplete, nor did [he] find the doctors used unacceptable clinical and laboratory techniques."). The ALJ in the matter under consideration had no question regarding the adequacy of the evidence. In fact, the record contained thorough treatment notes from both Plaintiff's neurosurgeon, the specialist at the pain management center, and the doctor who treated Plaintiff's depression. Additionally, the record contained a letter from Dr. Naushad, the pain management specialist, who opined that Plaintiff should not lift more than fifteen-to-twenty pounds, should not engage in extreme bending or twisting, and should not reach for high objects. In fact, the ALJ's RFC assessment imposed more significant limitations on Plaintiff than those imposed by Dr. Naushad.

Significantly, as noted by the ALJ, the medical records establish that after Plaintiff's surgery in December 2003, Dr. Park noted that Plaintiff's x-rays were stable and his back pain was better; that subsequently in March 2004, Dr. Park stated that Plaintiff's x-rays were stable, his back pain was better, and he was doing quite well; that a July 2004 CT scan showed good interbody fusion at all three levels; that although Plaintiff was involved with a pain management center, he was seen on a monthly basis and his treatment had been essentially routine and conservative; that there was no evidence of recent emergency room visits, hospitalizations, or injections for pain relief; that there were no recent psychiatric hospitalizations; and that Plaintiff required no more than monthly visits to a psychologist, psychiatrist, or other mental health professional. Further, as considered by the ALJ, although Plaintiff alleged that he is only able to stand, walk, or sit for less than one hour and that he must lie down or recline for most of the day, Dr. Naushad repeatedly described Plaintiff's gait as "normal." Further, despite Plaintiff's use of a cane, the record did not contain any medical opinion indicating that Plaintiff needed to use a cane and there were no indications in the medical records that

any treating physicians placed such significant restrictions on Plaintiff. The ALJ also considered that Plaintiff's use of medications did not suggest the presence of more limiting impairments. For these reasons, the ALJ concluded that the record did not support a finding that Plaintiff's impairments were as limiting as he alleged. As such, the court finds that the record was sufficiently developed so that the ALJ was not required to recontact any of Plaintiff's doctors. See Goff, 421 F.3d at 791.

Plaintiff contends that the ALJ improperly considered that Plaintiff's treatment has generally been successful. The record establishes, however, that Plaintiff's x-rays were stable and his back pain improved after the December 2003 surgery, that in July 2004 there was good interbody fusion at all three levels, and that Plaintiff did not require emergency room treatments or hospitalizations since the December 2003 surgery. As such, the court finds that the ALJ's conclusion that Plaintiff's treatment has been generally successful is supported by substantial evidence.

Plaintiff alleges that the ALJ improperly considered the absence of current reports from any acceptable medical source that Plaintiff cannot work or is disabled. However, no doctor opined throughout Plaintiff's medical history that Plaintiff is unable to engage in any type of employment. A record which contains no physician opinion of disability detracts from a claimant's subjective complaints. Edwards v. Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981). The court finds, therefore, that the ALJ properly considered that no acceptable medical source opined that Plaintiff is unable to work and that the ALJ's decision in this regard is supported by substantial evidence.

For the reasons set forth above the court finds that the ALJ's conclusion regarding Plaintiff's RFC is consistent with the medical records and that it is supported by substantial evidence in this regard. See McKinney, 228 F.3d at 863 ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and

others, and an individual's own description of his limitations") (citing Anderson, 51 F.3d at 779. Further, the court finds that the ALJ's decision is consistent with the Regulations and case law, including Singh and Lauer.

According to 20 C.F.R. § 404.1567(a), "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Indeed, SSR 85-15, 1985 WL 56857, at *5, states that "[w]here a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. . . . If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." The sitting requirement for the full range of sedentary work "allows for normal breaks, including lunch, at two hour intervals." Ellis v.Barnhart, 392 F.3d 988, 996 (8th Cir. 2005) (citing SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996). Additionally the range of sedentary jobs requires a claimant "to be able to walk or stand for approximately two hours out of an eight-hour day. The need to alternate between sitting and standing more frequently than every two hours could significantly erode the occupational base for a full range of unskilled sedentary work." Id. at 997 (citing 1996 WL 374185, at *7). The court finds, therefore, that the ALJ's conclusion that Plaintiff can engage in sedentary work is consistent with the requirements of sedentary work and consistent with the ALJ's finding regarding Plaintiff's RFC. As such, the court finds that the ALJ's decision regarding Plaintiff's RFC is supported by substantial evidence.

## B.      Polaski Factors:

Plaintiff contends that the ALJ's credibility findings are not based on substantial evidence. As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005); Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d273, 275 (8th Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker, 363 F.3d at 783 ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall, 274 F.3d at 1218. For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that Plaintiff did not allege any side effects from medication and that complaints of persistent side effects are not found in the treatment notes of the Plaintiff's physicians. The ALJ also considered, in regard to Plaintiff's alleged mental impairment, that Dr. Wilkerson reported in July 2005 that Plaintiff did "well as long as he was compliant with his medications." Tr. 16. The court notes that although Plaintiff had an adverse reaction to Wellbutrin, when his medication

was switched to Prozac, Dr. Wilkerson noted in October 2005 that Plaintiff was doing well on Prozac. Pursuant to Polaski, 739 F.2d at 1322, the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible. See Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994); Benskin, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain). Further, conditions which can be controlled by treatment are not disabling. See Estes v. Barnhart, 275 F.2d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d at 384; Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling); James for James v. Bowen, 870 F.2d 148, 450 (8th Cir. 1989). The court finds, therefore, that the ALJ properly considered that Plaintiff did well on medication and that he did not suffer side effects from medication. The court further finds that the ALJ's decision in this regard was supported by substantial evidence.

Second, as stated above, the ALJ considered that Plaintiff had received limited medical treatment since his surgery and that there was no evidence of recent emergency room treatments, hospitalizations, or injections for pain. In regard to Plaintiff's claim of a mental disorder, the ALJ considered that there were no recent psychiatric hospitalizations and that Plaintiff has not required more than monthly visits to a psychologist, psychiatrist, or other mental health professional. The ALJ also considered that the "absence of more intensive treatment during a period of alleged disability is inconsistent with severe and disabling symptoms." Tr. 17. Further, the ALJ considered that there was "no persuasive evidence that [Plaintiff] has been refused medical treatment due to an inability to pay." Tr. 17. Indeed, seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James, 870 F.2d at 450. In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's

failure. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). As such, the court finds that the ALJ's consideration of the absence of medical treatment is supported by substantial evidence and is consistent with the case law and Regulations.

Third, the ALJ considered Plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing." Tr. 18. In particular, the ALJ considered that Plaintiff showed "no evidence of pain or discomfort and he had no difficulty understanding or responding to questions posed to him. Tr. 18. While an ALJ cannot accept or reject subjective complaints *solely* on the basis of personal observations, Ward v. Heckler, 786 F.2d 844, 847-48 (8th Cir. 1986), the ALJ's observations of the claimant's appearance and demeanor during the hearing is a consideration. See Villarreal v. Secretary of Health & Human Services, 818 F.2d 461, 463 (6th Cir. 1987) (holding that given his opportunity to observe the claimant, the ALJ's conclusions regarding plaintiff's credibility should not lightly be discarded). As such, the court finds that the ALJ's consideration of Plaintiff's appearance and demeanor is supported by substantial evidence and is consistent with the case law and Regulations.

Fourth, the ALJ considered Plaintiff's daily activities and noted that Plaintiff's description of his daily activities "cannot be objectively verified with any reasonable degree of certainty." Tr. 18. Further, the ALJ considered that even if Plaintiff's description of his daily activities is accurate, "it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition, in view of the relatively weak medical evidence and other factors discussed in [the ALJ's] decision." Tr. 18. While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched

television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis, 239 F.3d at 967(citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792 (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming denial of benefits at the second step of analysis). In any case, while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence. Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002) (citing 20 C.F.R. §§ 416.908, 416.929). The court has found above that substantial evidence supports the ALJ's conclusion regarding Plaintiff's RFC. As such, the court finds that the ALJ's conclusion that Plaintiff's description of his daily activities is not consistent with the medical evidence is supported by substantial evidence and that the ALJ's decision in this regard is consistent with the case law and Regulations.

For the reasons articulated above, the court finds that the ALJ properly applied Polaski to the facts of Plaintiff's case and that the ALJ's conclusions regarding Plaintiff's credibility are supported by substantial evidence on the record.

**C.** **Mental Impairment:**

Plaintiff alleges that his mental impairment, depression, constituted a "objective medical evidence of pain to the same extent as an x-ray film," that his mental impairment is a non-exertional limitation which warranted the testimony of a vocational expert, and, because the ALJ did not obtain the testimony of a vocational expert, the ALJ's decision is not supported by substantial evidence.

First, while Plaintiff was diagnosed with depression, the mere existence of a mental condition, however, is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). The court notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that: "The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months."

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The sequential process for evaluating mental impairments is set out in 20 C.F.R. §404.1520a. This regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. See § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms and findings to determine if a mental impairment exists. See 20

34

C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms and laboratory findings. See 20 C.F.R. §§ 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. See 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. See 20 C.F.R. § 404.1520a(c)(3). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning, and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." See 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

Upon finding that Plaintiff did not suffer from a mental disability as a result of alleged depression, the ALJ in Plaintiff's case considered the medical evidence, as required by the first step of a mental impairment analysis. See Pratt, 956 F.2d at 835; 20 C.F.R. §§ 404.1520a(b)(1), 404.1508. In particular, the ALJ considered Dr. Wilkerson's evaluations of Plaintiff from April 18, 2005, July 18, 2005, and November 15, 2005. Indeed, the ALJ noted that the doctor's reports of July 18, 2005 and November 15, 2005 indicated that Plaintiff denied depression, anxiety, memory loss, suicidal ideation, hallucinations, paranoia, phobia, or confusion. As stated above the ALJ considered that Plaintiff did well when he was compliant with his medications. As further stated above, conditions which can be controlled by treatment are not disabling. See Estes, 275 F.3d at 725; Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford, 875 F.2d at 673; James, 870 F.2d at 450.

Where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not disabling. See Gavin v. Heckler, 811 F.2d 1195, 1198 (8th Cir. 1987). See also 20 C.F.R. §§ 404.1520a and 416.920a. The court has found above that the ALJ discrediting Plaintiff's description of his daily activities is supported by substantial evidence. Further, the court has found above that the ALJ properly considered that Plaintiff had not been hospitalized for his alleged mental impairment. Additionally, the court notes that Dr. Wilkerson reported in August 2004 that Plaintiff's depression had improved on medication and that Plaintiff reported that he had no problems with medications. Furthermore, in September 2004 Plaintiff reported that medication helped his insomnia. In December 2004, April 2005, and August 2005, Dr. Wilkerson reported that Plaintiff's insomnia and depression were stable. Significantly, in July 2005, as stated above, Dr. Wilkerson reported that Plaintiff was doing well and that he was in no acute distress.

The ALJ considered Plaintiff's history of depressed mood and concluded that Plaintiff's condition was "inconsistent with severe and disabling symptoms." Tr. 17.  He further concluded that the evidence established that Plaintiff's alleged *mental impairment* was *not severe* and that he has no limitations form a mental impairment.  Because the ALJ concluded at Step 2 of the sequential analysis that Plaintiff's alleged mental impairment was not severe, the ALJ was not required to proceed further with the sequential analysis in regard to Plaintiff's alleged mental impairment. See Goff, 421 F.3d at 790.  To the extent that it can be said that the ALJ did not follow the sequential analysis in regard to Plaintiff's alleged mental impairment, the court finds that the record supports the ALJ's overall conclusion. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003).  As such, the court finds that the ALJ's decision that Plaintiff does not have a severe mental impairment is supported by substantial evidence on the record.  Further, the court finds that the ALJ's determination that Plaintiff has no limitations as a result of a mental impairment is supported by substantial evidence.

**D. Vocational Expert Testimony**

Plaintiff argues that the ALJ should have solicited the testimony of a vocational expert due to Plaintiff's depression, which Plaintiff further alleges is a non-exertional limitation. Upon concluding that there was work available which Plaintiff can perform the ALJ relied upon the Medical-Vocational Guidelines.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no non-exertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. See Robinson, 956 F.2d at 839. See also Reynolds, 82 F.3d at 258 (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If

the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. Robinson, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. Id.

The court has found above that the ALJ's conclusion that Plaintiff's alleged mental impairment is not severe is supported by substantial evidence. Further, the court has found that the ALJ's conclusion that Plaintiff has no limitations resulting from an alleged mental impairment is supported by substantial evidence. Because substantial evidence supports the ALJ's decision that Plaintiff did not suffer from a disabling non-exertional impairment, the ALJ was not required to utilize the assistance of a vocational expert. See Reynolds, 82 F.3d at 258. Plaintiff's argument, that the ALJ should have utilized the testimony of a vocational expert, therefore, is without merit.

## VII.
## CONCLUSION

The court finds that the Commissioner's decision is supported by substantial evidence contained in the record as a whole. Thus, the Commissioner's decision should be affirmed. Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in his Brief in Support of Complaint be **DENIED;**

**IT IS FURTHER RECOMMENDED** that the relief sought by Defendant in his Brief in Support of Answer should be **GRANTED**.

**IT IS FINALLY RECOMMENDED** that judgment should be entered in favor of Defendant and against Plaintiff in the instant cause of action.

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE


Dated this 25th day of  April, 2007.